The LEGAL AID SOCIETY
OF ORANGE COUNTY,
Plaintiff,

v.

Matthew T. CROSSON, Chief Administrator of the Courts, State of New York, Defendant.

No. 91 Civ. 3468 (GLG).

United States District Court,
S.D. New York.

Feb. 26, 1992.

Michael H. Sussman, Goshen, N.Y., for plaintiff.

Michael Colodner, New York City (John Eiseman, Angela M. Yodice, of counsel), for defendant.

## OPINION

GOETTEL, District Judge.

Sadly, newspaper headlines record daily our society's growing willingness to do violence against those we live beside, those we do not know, and even those whom we love. Courts, long viewed as bastions of justice and security, now struggle against the same violence that invades our schools, roams our streets, and tears at the very fabric of our society threatening to rip it apart.

In no small way, this case concerns an ongoing attempt by a court to reclaim the security central to its ability to dispense justice to those passing through its marbled corridors. Today, these corridors are often guarded by a magnetometer, commonly known as a walk-through metal detector. The Orange County Family Court, located in the Government Center Building in Goshen and part of the Unified Court System of New York, operates a magnetometer at its entrance. Plaintiff objects to its use with respect to its juvenile clients.

The Government Center in Goshen is also home to County and State Supreme Courts although these facilities occupy separate wings of the Center from the wing housing the Family Court. Unlike the Family Court which has only one main entrance, the County and Supreme Courts have a number of possible entrances available for the public's use.

A magnetometer is a device shaped like a door-frame that uses an electromagnetic field to detect the presence of metallic objects. Pursuant to written rules governing the use of magnetometers effective April 1, 1989, all persons entering the Family Court, with the exception of building employees and people with official identification, are requested to remove all metal objects from their pockets and walk through the archway. If the magnetometer is activated, a person is again asked to remove any metal objects and pass through. If the person does not wish to be searched, he or she remains free to terminate the search, collect their belongings, and leave. If a second positive reading is registered, people still wishing to enter must be searched by a hand-held scanner until the metal object activating the magnetometer is located.

For the courts in Orange County, the Offices of Court Security Services ("OCSS") does not provide security services directly; it sets policy and provides procedure and training for use of magnetometers. Orange County deputy sheriffs provide the security at the Family Court. Before the magnetometer was installed, deputy sheriffs set up stations of desks and chairs between the three courtrooms used by the Family Court. There, they visually screened persons entering the Court and conducted pat-down searches when they reasonably suspected a person might be carrying a weapon.

In August 1989, at the request of the Hon. David Ritter, the then Administrative Judge of the 9th Judicial District (of which Orange County is a part), OCSS conducted a security survey of the 9th District courts. OCSS made several recommendations including installation of a metal detector at the Family Court and at the entrance to the County Court, Criminal Term.

Magnetometers have been installed in many of the courts in this area, particularly in family courts. Magnetometers have been used routinely in all New York City family courts since 1985 and in the City's criminal courts since 1988. Since 1987, magnetometers have been installed in all

the family courts in the 9th Judicial District in addition to 9 other counties in the state. In all, 32 courts statewide representing 10 counties use magnetometers and courts in 6 other counties currently have plans to install them. Federal courts, including the one these parties have entered, routinely use magnetometers.

In June 1990, OCSS, created in 1987 to implement a statewide initiative to improve court security, installed a magnetometer in the vestibule located just inside the entrance to the Orange County Family Court. Shortly thereafter, it was moved to a room immediately adjacent to the vestibule, located between it and the security station. Since the metal detector's installation, all people desiring to enter the court have been required to pass through the magnetometer. No magnetometer has been installed at any of the entrances to the County or Supreme courts in the Government Center. Deputy sheriffs posted the various entrances to the County and Supreme courts continue to visually inspect and selectively pat-down persons entering the buildings.

The decision to install the magnetometer at the Family Court was based upon several considerations. Family courts are viewed as having greater potential for violent outbursts due to the highly personal and emotional issues involved. According to Family Court Judges Scancarelli and Ritter, litigants are often angry and sometimes emotionally unbalanced. The Unusual Incidents records submitted by defendant attest to the unpredictable, often violent events that occur in family courts.

By way of anecdote, defendant points out that a fatal shooting occurred at the Westchester County Family Court before its magnetometer was installed in 1984. Additionally, Judge Ritter lodged several complaints concerning the lack of adequate security that enable people to enter his court with weapons. In February 1990, a Family Court clerk filed an incident report regarding a threat made by a litigant to shoot everyone in the courtroom if his daughter was taken away from him.

Over a three year period, an OCSS printout generated in August 1991 and incorporated in the 12th Annual Report of the Chief Administrator of the Courts, reported that some 96 threats were made against Family Court judges, representing over 25% of all the reported threats made against state judges. The Westchester County Family Courts reported some 36 violent incidents between 1984 and 1990, plus an additional 24 incidents involving minors and 42 incidents involving weapons with an additional 7 attributed to minors.

Plaintiff contends that no serious incidents have occurred at the Orange County Family Court, particularly relating to juveniles. Matthew O'Reilly, Security Coordinator for the 9th Judicial District, stated that records show that in the first year after the magnetometer was installed in the Orange County Family Court, 1,177 weapons were confiscated from individuals trying to enter the court.

On May 22, 1991, plaintiff Legal Aid Society of Orange County, a not-for-profit corporation providing legal representation to indigent persons in criminal matters and juveniles and minors in Family Court proceedings, commenced suit against Matthew T. Crosson, the Chief Administrator of the Courts of New York, on behalf of the juvenile clients it represents. Plaintiff claimed that the Family Court's use of its magnetometer violates the 4th Amendment rights of juveniles to be free from unreasonable searches.

Before the court today are defendant's and plaintiff's motions for summary judgment. Plaintiff essentially offers three arguments to support its contention that use of the magnetometer violates the 4th Amendment rights of juveniles. First, the OCSS failed to offer any tangible need to screen juveniles since no violent incidents or threats at the Orange County Family Court have occurred involving minors.

Second, less intrusive methods including visual inspections and selective pat-down frisks of suspicious persons are available and indeed continue to be used by Orange County courts. According to plaintiff, the County and Supreme Courts, also located in

the Government Center, continue to use visual inspections and selective pat-downs when suspicious persons are spotted, and still report no serious incidents involving minors and weapons. Third, plaintiff contends that excluding minors from the metal detector searches for adults is feasible since juveniles are able to walk around the magnetometer and into the juvenile waiting room without interrupting its use by adults entering the Court.

Defendant responds that requiring all persons entering the Family Court to pass through a metal detector is eminently reasonable and poses a minimal, relatively inoffensive means of conducting a search for weapons. The need to protect Family Courts from the very real potential for violent incidents more than justifies the use of magnetometers. The emotional stresses of divorce proceedings, custody fights, incidents of child abuse, domestic violence, and criminal sentencings for minors are fertile ground for violent incidents in family court.

Defendant argues that reducing the chances that such incidents will involve weapons before some incident actually occurs by using magnetometers is clearly reasonable when viewed against this backdrop. Lastly, juveniles retain no greater rights to privacy under the 4th Amendment than adults so no legal reason exists to exclude them from perfectly reasonable searches.

The standards we must apply in deciding these summary judgment motions are well-settled. Rule 56 of the Federal Rules of Civil Procedure states that summary judgment is proper where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court's role is not to weigh the evidence and resolve factual issues but rather to simply determine whether any material issues of fact do indeed exist. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2nd Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

█ Both parties note that "administrative searches," though warrantless, are permissible under the 4th Amendment.

*See Klarfeld v. U.S.*, 944 F.2d 583, 586 (9th Cir.1991). A limited warrantless search of people wishing to enter sensitive facilities is permitted if the search is part of a general practice and not for the purpose of securing evidence for criminal investigations. *See id.* Our court of appeals has held that magnetometer screenings constitute a search under the fourth amendment. *Wilkinson v. Forst*, 832 F.2d 1330, 1340 (2nd Cir.1987), *cert. denied*, 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 907 (1988). Plaintiffs do not allege nor does evidence exist in the record indicating that the magnetometer searches were intended to do anything except deter violence in the Family Court by locating weapons in possession of people wishing to enter the court.

█ The constitutional test is whether the particular administrative search is reasonable. *Id.* To make this determination here, we must balance the nature and quality of the magnetometer search against the need for the search to further the governmental interest involved, here the protection of judicial officers and visitors to the Family Court. *See Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).

There is no material dispute over the nature of magnetometer searches. A person entering the Family Court is asked to remove all metal objects from their person and step through the magnetometer. If the device registers a metal object, the person is asked to check for possible metal possessions on them and pass through a second time. If the metal detector sounds a second time and the person still wishes to enter, a hand-held metal scanner is passed along their body to locate the metal object.

As other courts have noted, use of a magnetometer involves "the absolutely minimal invasion of privacy," *United States v. Albarado*, 495 F.2d 799 (2nd Cir. 1974), representing "a relatively inoffensive method of conducting a search ... less intrusive than alternative methods." *McMorris v. Alioto*, 567 F.2d 897, 900 (9th Cir.1978). Passing through a magnetometer has none of the personal indignities or humiliations of physical searches or the like. There is no detention involved nor probing of people's bodies. In short, the

degree of intrusiveness caused by the magnetometer is minimal at best, and much less intrusive than other equally thorough methods of preventing weapons from entering a courthouse.

On the other side of the balance, the governmental interest in safeguarding courthouses is paramount. Given the plague of courtroom violence, the need to protect judicial officers and the steady stream of visitors to the Family Court is undeniable. While plaintiffs stress that no serious incidents involving juveniles have occurred at the Orange County Family Court, they cannot refute the existence of the potential for violent incidents.

The rationale motivating the use of magnetometer searches, namely the perceived danger of violence, cannot be simply confined to the specific locations at issue in this case. *See Wilkinson,* 832 F.2d at 1339. Indeed, courts have taken judicial notice of the threats of violent acts directed at courthouses that have given rise to an immediate need for protective measures. *See, e.g., McMorris,* 567 F.2d at 899; *People v. Alba,* 104 Misc.2d 1095, 430 N.Y.S.2d 923, 931 (Bronx County Supreme Court 1980), *rev'd on other grounds,* 81 A.D.2d 345, 440 N.Y.S.2d 230 (1st Dept.1981).

Plaintiff contends that no facts exist showing that any violent incidents or incidents of weapons being secreted into court by minors have yet occurred at the Orange County Family Court. This is a bit misleading however. For family courts in other counties where OCSS personnel are directly responsible for security, Unusual Incident Reports have been maintained recording various incidents of involving seizure of weapons and violence. No such reports were produced for the Orange County Family Court because the local deputy sheriffs in charge of its security did not submit any to OCSS, at least before 1989. *See* O'Reilly Deposition at 42–43, 50; Perno Deposition at 48–49.

The absence of such reports, however, does not prevent us from viewing the prevention of such incidents as of significant importance. The Family Court does not need to wait until a tragically violent episode occurs as happened at the Westchester County Family Court in 1984 before it can institute magnetometer searches. While most do not indicate the age of the persons involved, the Unusual Incident Reports from those county family courts that did produce such records demonstrate that both adults and juveniles have been involved in violent incidents and confiscation of dangerous weapons. *See, e.g.,* O'Reilly Affidavit, Exhibit 5 and Exhibit 6. This fact was also noted in a recent decision by a New York state court that upheld the use of random magnetometer searches at a public school. *See People v. Dukes,* 151 Misc.2d 295, 580 N.Y.S.2d 850 (Criminal Court, 1992). The court in *Dukes* noted that over 2000 weapons were recovered from students during the 1990–91 school year alone. *Id.*

In the first year of operation at the Orange County Family Court, some 1,177 weapons were confiscated. Among these were 12 guns, 991 knives, and 68 razors. *See* O'Reilly Affidavit, Exhibit 7. Given the evidence of violence and weapons confiscations at the family courts in New York, it seems clear that Orange County's installation of a magnetometer was a reasonable, prudent, and effective preventative measure.

In this holding we follow the path taken by other courts that have also concluded that magnetometer searches do not run afoul of the fourth amendment. *See, e.g., McMorris,* 567 F.2d 897; *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir.1972) (upholding regulation requiring all persons entering a federal courthouse to submit to a search of their bags and packages); *Justice v. Elrod,* 649 F.Supp. 30 (N.D.Ill.1986), *aff'd,* 832 F.2d 1048 (7th Cir.1987) (holding that the realistic possibility of a problem is enough to support the use of magnetometers).

Tragically, the effort today to secure the safety of the public courts resembles a battle. Protecting judicial officers and members of the public from the omnipresent threats of violence that surround our public institutions involves greater security efforts and vigilance than ever before. In this fight, magnetometers have become a tool of choice. Without unduly intruding upon people's privacy, they effectively help maintain the security of our courts by de-

tecting the presence of weapons concealed among its daily visitors. If courts cannot secure the safety of its judicial officers and the public inside the courthouse doors, they surely cannot secure justice for society beyond them.

To conclude, we find that no genuine material disputes exist concerning the dangers of violent incidents at our nation's courts, particularly in the heated, angry atmosphere permeating family courts. All visitors to the Family Court are required to pass through the magnetometer; the deputy sheriffs operating it receive training in its use and follow set procedures. As a result, we are not prepared to shackle courts by preventing them from using a device proven effective in reducing the dangers of violence. The use of magnetometers to screen juveniles, as a matter of law, does not represent an unreasonable search violating of the fourth amendment. Consequently, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.

SO ORDERED.